CO-OPERATIVE   LIVE   STOCK   COMMISSION
    COMPANY v. JAMES A. BROWNING et al., Appellants.

In Banc, July 2, 1914.

1. **CAUSE OF ACTION: Conspiracy Between Commission Merchants Not to Buy from or Sell to Another Commission Merchant: Damages.**  Sections 10298-10305, Revised Statutes 1909, forbidding a combination "in restraint of trade or competition in the importation, transportation, · manufacture, purchase or sale of any product or commodity in this State or any article or thing bought or sold whatsoever," and giving to "any person injured in his business or property" by such combination the right to "recover threefold the damages by him sustained," do not give to a commission merchant a cause of action against other commission merchants engaged in buying and selling live stock for entering into a pool and combination to neither sell to nor buy from him live stock, nor to permit any other commission merchant to remain a member of their live-stock exchange who either sells to or buys from him.   Such commission merchant is not engaged in trade, but is simply the agent of those who are.   Nor could a combination between the other commission merchants result in "restraint of competition in the importation, transportation, manufacture, purchase or

sale of any product or commodity in this State." Nor are such other commission merchants purchasers within the meaning of the statute, since the combination was not entered into for the purpose of doing the things prohibited by the statute, but solely to injure the said merchant's commission business. In order that such commission merchant may have a cause of action under such statutes against the other commission merchants composing the association or exchange, it is necessary both to allege and prove that as a result of such combination injury resulted to plaintiff's patrons or customers, or to stock raisers or shippers, or to the trade in live stock at the particular stock yards, or that importation of live stock thereto or transportation of live stock therefrom was lessened.

2. **HISTORY OF STATUTE: Combinations in Restraint of Trade.** To properly ascertain the meaning of a remedial statute it is the duty of courts to read it in the light of its historical setting, to hold in view the existing evils it was intended to abolish, and to examine the instrumentalities provided by the Legislature for their destruction; and if the anti-trust statutes are so viewed, it is apparent that their purpose was to prohibit pools and combinations that would restrict commerce or increase the prices of the necessaries of life, either by limiting competition or the supply, or by "boycotts" or rebates to drive small dealers out of business. They never were intended to give to a mere agent engaged in the purchase and sale of any such necessary for others the right to recover damages from other such agents for the mere refusal to buy from or sell to him.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn*, Judge.

REVERSED AND REMANDED.

*Edward J. White, Martin L. Clardy, J. Walter Farrar, Ball & Ryland, Kinley & Kinley* and *R. W. Goldsby* for appellants.

(1) The petition is insufficient. State v. Loomis, 115 Mo. 307; Cooley, Const. Lim. (6 Ed.), 484; 2 Story on Const. (5 Ed.), 1950; Gladdish v. Live Stock Exch., 113 Mo. App. 725; Anderson v. United States, 171 U. S. 604; United States v. Greenhut, 51 Fed. 210; In re Greene, 52 Fed. 104; Rice v. Oil Co., 134 Fed. 464. (2) The verdict and judgment were against the law. R. S. 1899, secs. 8981, 8978. (3) The acts of 1899 and 1907 are unconstitutional, insofar as they or either of them

purport or may be construed to give an action against defendants. State ex rel. v. Associated Press, 159 Mo. 461; State v. Coffee Co., 171 Mo. 634; Shiveley v. Lankford, 174 Mo. 535; State ex rel. v. Vandiver, 222 Mo. 206; State v. Julow, 129 Mo. 163; In re Goode, 3 Mo. App. 230; State ex rel. v. Lafayette Co. Ct., 41 Mo. 39; State v. Persinger, 76 Mo. 346; Witzman v. Railroad, 131 Mo. 612.

*Gage, Ladd & Small* for respondent.

(1) "We would seem to lack perception of the true nature of things were we to be deceived or blinded by the screen or pretense which the conspirators raised to mask their operations. Courts should be as astute to discover and discern the truth as the guilty are to conceal it." Foot-Race Case, 147 Fed. 327. (2) There is abundant evidence tending to prove that the defendants and all other members of the traders' exchange boycotted and threatened others not members of their exchange for and from doing business with the plaintiff. (3) In order to constitute a boycott or threaten to boycott, it was not necessary to use or threaten violence to the person or property of anyone. It is sufficient if there was an injury or threat to cause a loss to another's business. Door Co. v. Fuelle, 215 Mo. 4221. (4) "The rule of reason" is excluded by our statutes, and any combination which tends to limit or control or lessen trade or competition, no matter how little, falls within the condemnation of the antitrust laws of this State. State v. People's Ice Co., 246 Mo. 221. (5) As a matter of law an agreement between defendants or between them and other members of the traders exchange not to buy from or sell to the plaintiff's customers through the plaintiff, was a combination, agreement, trust, pool, association and conspiracy, etc., to restrain and limit trade and competition at this great cattle market at the stockyards in Kansas City, and whether such limitation or restraint of trade was

"great or small," the law was violated. State ex rel.
v. People's Ice Co., 246 Mo. 221. (6) "It is the com-
bination or agreement that results in restraint of trade
that the statute denounces, whether the result is ac-
complished by the act of each individual on his own ac-
count, doing as he agreed to do, or by the joint action
of all. . . . It is the combination to accomplish that
result that the statute is aimed to prevent." State ex
rel. v. Live Stock Exchange, 211 Mo. 193; State ex rel.
Barker v. Assurance Co., 158 S. W. 644. (7) All the
sections and articles of our antitrust statutes are *in
pari materia* and must be construed as if contained in
one act. Hence it follows that section 8981 in article 2
of chapter 143, relating to pools, trusts and conspira-
cies, Revised Statutes 1899, which gives triple damages
to any person injured in his property or business aris-
ing from any violation of that article, also gives such
triple damages arising from any violation of any pro-
visions of article 1 of said chapter 143. State v. Oil
Co., 218 Mo. 354; State v. Elevator Co., 106 N. W. 983;
Brewing Co. v. Belinder, 97 Mo. App. 64. (8) It is too
late to challenge the constitutionality of our antitrust
statutes for the alleged reason that they interfere with
the right to contract or take property without compen-
sation, or due process of law, or deny any person the
equal protection of the law. All these questions have
long since been foreclosed and settled by this court.
Standard Oil Case, 218 Mo. 378. (9) The case of An-
derson v. United States, 171 U. S. 604, so much relied
on by the defendants, is not in point. All that case de-
cided, as has been held by the Court of Appeals of this
State and the Supreme Court of Kansas, was that the
members of the traders exchange were not engaged in
interstate commerce; and therefore the Sherman Act
did not apply. Brewing Co. v. Belinder, 97 Mo. App.
64; State v. Wilson, 84 Pac. 737. Furthermore as
pointed out in State ex rel. v. Live Stock Exchange, 211
Mo. 197, and State v. Aikens, 83 Kan. 792, all the rules

of the traders exchange were not before the court in the Anderson case, especially the rule requiring the payment of a thousand dollar entrance fee, and the approval of two-thirds of the members before any person could enter the portals of the exchange and be a trader on the yards with none to molest or make him afraid. Besides, it may be said that when the Anderson case was decided this antitrust legislation was a sort of a "Mysterious Stranger"—to be kept at a dignified and perfectly proper distance—and did not meet with the cordial reception and hearty welcome which its great virtues entitled it to, and which it has since, upon better acquaintance, been accorded, especially by the Supreme Court of this State. (10) The statutes so far as they provide for a civil suit to recover triple damages are not penal. Atlanta v. Foundry & Pipe Works, 127 Fed. 23; Casey v. Transit Co., 116 Mo. App. 250. (11) It is settled in this State that the enforcement and construction of these antitrust statutes is not to be "approached with a sour face;" but these statutes are remedial and must be liberally construed, so as to advance the remedy for the great wrongs therein denounced. It is the policy and purpose of the law that these statutes shall be rigidly enforced against all wrongdoers, and that the guilty shall not escape through any astute or artificial construction which subverts the general intent of the lawmakers—which was to destroy the whole brood of trusts and combines against trade in this State, from the least unto the greatest. State v. Oil Co., 218 Mo. 359; State ex inf. v. Ins. Co., 152 Mo. 43. (12) The antitrust laws apply to commission merchants. The learned counsel for the appellants, neither at the trial of the case below nor in their briefs in this court, made any claim or point that the antitrust statutes did not apply to combines or boycotts against commission merchants, and therefore we did not argue that point or submit any authorities. In State ex rel. v. Live Stock Exchange,

211 Mo. 181, this court passed upon the very question, and held that the statute did apply to commission merchants, members of the Kanass City Live Stock Exchange. See, also, State v. Wilson, 73 Kan. 334. So the record in this case shows that all the live stock—cattle, hogs and sheep—which comes to Kansas City is sent to commission merchants and sold by them. It is true that they sell on commission and do not own the stock, but they are the parties who actually sell it on the market, and for the most part the owners never know for what the stock is sold until after a report of the sales is made. The commission men represent the owners, stand in the place of the owners and they are certainly bound and controlled by the antitrust laws of this State. And they can enter into an agreement and combine for the purpose of restraining trade and competition, or of lessening or raising prices, or doing anything which the owner himself could do in violation of the antitrust law. The antitrust law was primarily enacted for the purpose of protecting the producers and the consumers of farm products and other necessaries of life from combinations or monopolies which affect the prices or which tend to lessen competition in the trade. It is well known that nearly all of the food products, both raw material and finished, are for the most part handled by commission men, who, of all others, are in a position to enter into combines affecting the prices and trade and competition in the same. Butter, eggs, cheese, potatoes, flour, sugar, apples, oranges, lemons, fruits of all kinds, live stock—cattle, hogs, sheep, goats—poultry are bought and sold, and the prices are fixed, as a matter of fact, by commission merchants. And this antitrust statute was passed mainly, for the very purpose of protecting the producers and consumers of these food stuffs—the farmers and the town people—from combines and trusts formed by commission men. Therefore, to read them out of the benefits or the penalties of these statutes,

would be to defeat the primary purpose of the law. There is nothing in the statutes saying that the combines or contracts or agreements in restraint of trade, condemned by the statutes, can only be or must be made by the owners of the products. But the statute says, "If any two or more persons or corporations who are engaged in buying or selling any article of commerce," Sec. 8978, R. S. 1899; that "all arrangements, contracts, agreements or combination between persons or corporations, or between persons or any association of persons or corporations, designed or made with a view to lessen, or which tend to lessen, full and free competition," Sec. 8966, R. S. 1899; and "Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or understanding with any person or persons in restraint of trade or competition," Sec. 8965. The same language is used in the revised law of 1907. So that it is nowhere suggested or implied in any section of the statute, or in any of the language used, that a vicious agreement in restraint of trade can only be made by the owners of the produce; but it is assumed that such agreements may be made by others, to-wit, by their agents and other persons engaged in the actual business of buying or selling or fixing the prices, such as commission merchants. To hold otherwise would be to expose the producers of food stuffs (the farmers) and the consumers (the town people) to all the evils which the statute so clearly intended to prevent. This cannot be the law. The section of the statute providing the remedy says that "any person injured in his business" by a violation of the statute shall have a cause of action. He does not have to be the owner of anything, but if his business is injured or destroyed by an illegal combine, he can recover his damages. These statutes are highly salutary and remedial in their purpose, and are not to be destroyed or repealed by a strict or hostile construction. State v.

Oil Co., 218 Mo. 359, 384, 460; State ex inf. v. Ins. Co., 152 Mo. 43; State ex inf. v. Oil Co., 194 Mo. 148; State ex inf. v. Packing Co., 173 Mo. 356. All who are engaged in trade must be embraced in these antitrust laws, otherwise they are void as discriminatory and invading the equal protection of the law provisions of the Federal Constitution. The first Illinois antitrust law was declared void because it exempted "live stock while in the hands of the raiser." Connolly v. Pipe Co., 184 U. S. 554.

WOODSON, J.—The plaintiff instituted this suit November 5, 1907, in the circuit court of Jackson county against the defendants, to recover $96,000, actual and treble damages alleged to have been sustained by reason of a pool, trust, combination and agreement made and entered into by and between them and others, to destroy the plaintiff's business—live stock commission business—at Kansas City, Missouri, in violation of the statutes hereinafter mentioned.

A trial was had which resulted in a verdict of $19,500, in favor of the plaintiff, and under the statute the court trebled that sum and rendered judgment for the plaintiff and against the defendants for the sum of $57,500.

This suit is novel, in that it differs from all others growing out of pools, trusts and combines, with which I am familiar, and is a fight between agents or the so-called middle men, and not between the State or her officers against manufacturers and carriers or financial or industrial institutions for conspiring to control commerce, prices, etc., except in an incidental manner, if at all, which will be presently stated, coupled with the earnest insistence of counsel for defendants that the petition does not state facts sufficient to constitute a cause of action against the defendants, and these facts necessitate a reproduction of it here, formal parts being omitted:

## PETITION.

"Plaintiff states that it is, and at all the times hereinafter mentioned, was a corporation duly organ-ized under the laws of the State of Colorado, and duly authorized and licensed to do business in the State of Missouri.

"That at all such times the plaintiff was and still is empowered and authorized to carry on, and actually engaged in, the business of a live stock commission merchant, buying and selling cattle, hogs, sheep and live stock of all kinds, on commission, for its patrons and customers, at the Kansas City stockyards, in Kan-sas City, Jackson county, Missouri; and that the de-fendants and others are and were at all such times traders and speculators engaged in buying and selling cattle, hogs, sheep and other live stock, and especially live stock known as 'stockers' and 'feeders' hereinaf-ter mentioned, at said stockyards, and were and are members of a voluntary association known as the Trad-ers Live Stock Exchange.

"The Kansas City Stockyards Company is and for many years has been a corporation owning and con-ducting said stockyards at said Kansas City, for the purpose of affording a market for the buying and sell-ing of live stock produced in the State of Missouri, and other States and Territories; and that by its char-ter said company is required to keep said market open and free for the use of all persons and corporations desiring to trade thereat, and for that purpose it has at all times owned and maintained large yards and pens, together with the necessary driveways, troughs, buildings and equipment for the care, handling and sale of such live stock.

"That at all such times and at the present time large numbers of cattle, hogs, sheep and other live stock have been and are daily shipped and transported from said State of Missouri, and other States and Ter-

ritories to said Kansas City stockyards, and are bought
and sold upon said market. That said market is the
second largest live stock market in the United States.

"That the live stock so sold upon said market is
divided into two general classes; fat stock, or stock fit
to be slaughtered, which is nearly all purchased by the
packers and order buyers (said order buyers being per-
sons who purchase such stock on orders for dealers at
other localities), and 'stockers' or 'feeders,' which, for
the most part, consist of cattle not fitted or ready for
slaughter, and which are bought at said market by the
defendants and other members of said Traders Live
Stock Exchange, who, as aforesaid, are and were trad-
ers and speculators upon said market, and who, in turn,
resell the same to farmers and cattle feeders, to be
taken to the country to be fed and fattened, and ulti-
mately returned to the market as fat cattle, to be sold
for slaughter.

"That a greater number of such stockers and feed-
ers are and have, for many years past, been bought and
sold in said Kansas City stockyards than at any other
market in the United States; and that such stockers and
feeders constitute a very large part of the cattle re-
ceived at said market, more than seven hundred thou-
sand such stockers and feeders being annually received
and sold thereat.

"That besides the plaintiff, there are and at all
such times were a large number of other persons and
corporations doing business at said Kansas City stock-
yards, as live stock commission merchants, all, or prac-
tically all, of whom, except the plaintiff, are and were
at all such times members of a voluntary association
known as the Kansas City Live Stock Exchange. That
the plaintiff never was a member of said association,
and during the times herein mentioned has been the
only commission merchant doing business at said stock-
yards not a member of said Kansas City Live Stock
Exchange. That at all such times the plaintiff has

charged less commissions for buying and selling cattle, hogs, sheep and other live stock for its patrons and customers, than were charged and collected for buying and selling such live stock by the other commission merchants at said stockyards, who, as aforesaid, were and are all members of said Kansas City Live Stock Exchange, and that plaintiff has sold large numbers of fat cattle for its patrons and customers.

"That at all times herein mentioned the plaintiff has had and still has a very large number of patrons and customers, raisers and feeders of live stock, who were and are desirous of buying and selling their stockers and feeders through the plaintiff, as such commission merchant, and would have done so and would do so now but for the combination and conspiracy against the plaintiff entered into and maintained by the defendants, as hereinafter stated.

"Plaintiff states that it commenced its said business as a commission merchant at said stockyards on the first day of September, 1906, and ever since said time has been and still is engaged in such business at said stockyards, as hereinbefore stated.

"Plaintiff further states that at the time of and immediately before the date of the commencement of business by the plaintiff, the defendants, as such traders and speculators, buyers and sellers, of live stock, and especially of stockers and feeders at said stockyards in Kansas City, Jackson county, Missouri, created, entered into and became members of and participated in a pool, trust, agreement, combination, confederation and understanding among and between themselves and each other and between themselves and other members of said Traders Live Stock Exchange, in restraint of trade and competition in the importation, transportation, purchase and sale of such stockers and feeders at said Kansas City stockyards, in this State, by agreeing among and between themselves and with each other, and between them-

selves and other members of said Traders Live Stock Exchange and the members of said Kansas City Live Stock Exchange, to refuse to buy from or sell to any of the plaintiff's patrons or customers through the plaintiff as such commission merchant, any such stockers and feeders at said stockyards, and in pursuance of such pool, trust, agreement, combination, confederation and understanding, have ever since then refused and still refuse to so buy or sell through the plaintiff, any such stockers or feeders at said Kansas City stock-yards.

"Plaintiff further states that at the time and immediately before the date of the commencement of business by the plaintiff, the defendants as such traders and speculators, buyers and sellers of live stock, and especially of stockers and feeders at said stockyards in Kansas City, Jackson county, Missouri, created, entered into and became members of and participated in a pool, trust, agreement, combination, confederation and understanding among and between themselves and with each other, and between themselves and other members of said Traders Live Stock Exchange and the members of said Kansas City Live Stock Exchange, to regulate, control and fix the price of such stockers and feeders, so bought and sold at said Kansas City stockyards, by agreeing among and between themselves and with each other, and between themselves and other members of said Traders Live Stock Exchange, and the members of said Kansas City Live Stock Exchange, not to buy from or sell to any of the patrons or customers of the plaintiff through the plaintiff as such commission merchant, any such stockers or feeders, and ever since then, in pursuance of such unlawful combination and understanding, refusing, and still refusing to so sell to or buy from the patrons or customers of the plaintiff any such stockers or feeders at said Kansas City stockyards.

"And plaintiff states that at the time and immediately before the date of the commencement of business by the plaintiff, the defendants, and other members of said Traders Live Stock Exchange, as such traders and speculators, buyers and sellers of live stock, and especially of stockers and feeders, at said stockyards in Kansas City, Jackson county, Missouri, created, entered into and became members of and participated in a pool, trust, agreement, combination, confederation, association and understanding to control and limit the trade in such stockers and feeders and to limit competition in such trade by refusing to buy from or sell to any of the patrons or customers of the plaintiff through the plaintiff as such commission merchant, any such stockers and feeders, for the reason that plaintiff was not a member of or party to such pool, trust, agreement, combination, confederation, association and understanding, and boycotted and threatened and ever since then have boycotted and threatened, and still boycott and threaten any and all persons from so buying or selling any such stockers or feeders to the plaintiff's patrons or customers through the plaintiff as such commission merchant; and that plaintiff is not and never has been a member of or party to said pool, trust, agreement, combination, confederation, association and understanding in reference to such stockers and feeders aforesaid.

"Plaintiff says that the defendants, ever since the plaintiff commenced business as aforesaid, have maintained and continued and still maintain and continue such pool, trust, agreement, combination, confederation, association and understanding and conspiracy in restraint of trade aforesaid. That at all the dates and times herein mentioned, the defendants have entered into, among and between themselves and with each other, and between themselves and other members of said Traders Live Stock Exchange, and the members of said Kansas City Live Stock Exchange, arrange-

ments, contracts, agreements, combinations and understandings designed and made with a view to lessen, and which tend to lessen lawful trade and full and free competition in the importation, transportation and sale in this State of such stockers and feeders at said Kansas City stockyards in Kansas City, Jackson county, Missouri, in this, that at the time aforesaid when plaintiff commenced business, ever since then and still, the defendants, by an arrangement, contract, agreement, combination, understanding and conspiracy in restraint of trade, among and between themselves and with each other and between themselves and other members of said Traders Live Stock Exchange and the members of said Kansas City Live Stock Exchange, at all such times have refused and still refuse to buy from any of the patrons or customers of the plaintiff through the plaintiff, as such commission merchant, any such stockers and feeders, and have at all such times refused and still refuse to sell to any of the customers or patrons of plaintiff, through the plaintiff as such commission merchant, any such stockers or feeders.

"Plaintiff further states that defendants, and said other traders and speculators at said stockyards, also bought and sold thereat, large numbers of cows, calves and other live stock, and that all the above agreements, combinations, pools, trusts, arrangements, conspiracies and acts of defendants and others, hereinbefore set forth, against the plaintiff and its customers and patrons, also related to, embraced and included cows, calves, and all other live stock so dealt in by said defendants and other traders and speculators, as well as stockers and feeders as hereinbefore set forth.

"And plaintiff states that by reason of the unlawful and illegal acts and conspiracies of the defendants, aforesaid, the plaintiff has been wholly prevented from buying or selling or doing any business as such com-

mission merchant, in such stockers and feeders, cows, calves and other live stock bought and sold and dealt in by the defendants and said other traders and speculators and members of said Traders Live Stock Exchange, at said stockyards, as aforesaid, and is still so prevented and disabled from doing any such business. That but for the said unlawful acts and conspiracies of the defendants, as aforesaid, the plaintiff, owing to its large number of patrons and customers, would have done a large business at said stockyards in buying and selling such stockers and feeders, cows, calves and other live stock on commission, from which it would have realized a profit of twenty thousand dollars in the aggregate, from the date when it commenced business as aforesaid up to the date of the filing of the petition herein.

"Plaintiff states that before it commenced business as aforesaid, as such commission merchant, Blanchard & Ehrke and Burnside-Jardon Company were and for a long time had been engaged in the live-stock commission business at said stockyards, and had a large number of customers and patrons, for whom said commission merchants did a large business, in handling such stockers, feeders, cows, calves and other live stock dealt in by the defendants and said other traders and speculators; that for the purpose of enabling the plaintiff to start its said business with a large number of customers for the class of live stock last above mentioned, at great expense, it purchased from said Blanchard & Ehrke and said Burnside-Jardon Company, their said live-stock commission business, including the good will and patronage thereof, and also entered into contracts, employing agents and salesman for the purpose of carrying on said business, and paid out large sums of money as salaries to such agents and salesmen, in endeavoring to carry on said business, but that plaintiff was wholly unable to do any such business whatever, on account of the unlawful and illegal acts

and conspiracies of the defendants, as aforesaid, and was obliged, at great cost and expense to itself, to cancel said contracts of employment; by reason of all of which the plaintiff was damaged and actually lost the sum of twelve thousand dollars.

"Plaintiff further states that the defendants, at the time they entered into the unlawful trusts, agreements, combinations and conspiracies hereinbefore set forth, knew that the necessary inevitable result thereof, and of their acts aforesaid, in pursuance thereof, would be to prevent the plaintiff from deriving the profits aforesaid, and to cause it the actual loss and damage aforesaid.

"That the plaintiff has been injured in its business by the defendants, by reason of the unlawful acts and conspiracies of the defendants aforesaid, and thereby sustained damages in the sum of at least thirty-two thousand dollars.

"Wherefore, plaintiff prays judgment against the defendants for the sum of ninety-six thousand dollars, being three-fold damages sustained by it, for costs of suit, and for reasonable attorneys' fees, all as required and allowed by the statutes in such case made and provided."

## ANSWER.

The answer was:

"First: That the defendants deny each and every allegation in said petition contained.

"Second: That section 1 of the Laws of 1899 (page 316), being section 8978, Revised Statutes 1899, and section 4 of said act being section 8981, Revised Statutes 1899, are unconstitutional in that, said enactment (a) violates section 28 of article 4 of the Constitution of Missouri, by containing more than one subject, and by failing to express in the title of said act, as being within the object and scope thereof, a private personal right of action in damages for its violation;

and (b) in so far as said act and each section thereof undertakes to prohibit and make unlawful a refusal to buy from, sell to or deal with any person or corporation for any reason whatever or for the reason stated in said act, it is unconstitutional and in violation of section 30 of article 2 of the Constitution of Missouri, and Amendment Fourteen of the Constitution of the United States, in that it deprives persons of liberty and property without due process of law; and (c) said act violates said provisions of the Constitution of the State of Missouri and of the United States by depriving persons of liberty and property without due process of law, in so far as said act undertakes to prohibit and make unlawful any agreement between two or more persons to refrain from or refuse to do business with any other person for any reason or for the reason mentioned in said act.

"Third: The act of March 19, 1907 (Laws 1907, page 377), is unconstitutional in that:

(a)   Its title contains more than one subject in violation of section 28 of article 4 of the Constitution of the State of Missouri:

(b)   It violates section 30 of article 2 of the Constitution of Missouri, and Amendment Fourteen of the Constitution of the United States, in so far as it undertakes to make unlawful an agreement between two or more persons to refuse to buy from or sell to any other person for the reason mentioned in said act, and in so far as it undertakes to prohibit individuals from separately or together refusing to have dealings with any other persons in the conduct of their individual business it undertakes to deprive them of liberty and property without due process of law within the meaning of the State and Federal Constitutions aforesaid.

"Wherefore, the defendants pray judgment."

I.   It is earnestly insisted by counsel for appellants that the petition filed in the cause does not state

facts sufficient to constitute a cause of action against their clients.

This insistence is predicated upon many grounds stated; but from the view we take of the case it will not be necessary to follow counsel through their long and able arguments made in support thereof.

I am satisfied that the statutes under which this suit was brought and prosecuted, do not give the plaintiff a cause of action against the defendants, even though it should be conceded that everything charged in the petition be true.

**Cause of Action: Conspiracy Between Commission Merchants Not to Sell to or Buy from Another Commission Merchant.**

In passing upon the sufficiency of the petition we must first get a clear conception of the principal facts charged therein before we can intelligently apply the law thereto.

(a) The petition charges that the plaintiff is a corporation organized for the purpose of buying and selling live stock on commission, at the Kansas City Stock Yards; (b) that the Kansas City Stock Yards is a corporation, organized for the purpose of affording a market for buying and selling live stock, and that its charter requires it to keep said market open and free for the use of all persons desiring to trade thereat; (c) that the live stock bought and sold on that market consisted of two classes, fat stock purchased by packers, and stockers or feeders, which are not fit for slaughter and are sold to feeders, and after being fattened are then sold to the packers; (d) that the Kansas City Live Stock Exchange is a voluntary association, composed of individuals and corporations each engaged in buying and selling in said yards, live stock on commission —the fat stock to the packers, and the thin or stockers, to the traders, who will be specially noticed later; (e) that the Traders Live Stock Exchange, of Kansas City, was a voluntary association, composed of individuals and corporations, each engaged in buying and selling

live stock of all kinds on their own account. Their principal business, however, was to purchase feeders and stockers, which they then sold to farmers and feeders; (f) that defendants were members of the latter exchange; (g) and the plaintiff, as previously stated, was a commission merchant, or agency · pure and simple, engaged in buying and selling live stock of all kinds, for a commission, for its various patrons; but it was not a member of the Kansas City Live Stock Exchange or of the Traders Live Stock Exchange, previously mentioned.

Now, the gravamen of the plaintiff's charge is, that the defendants, who were traders, as previously mentioned, and members of the Traders Live Stock Exchange, entered into a pool, trust and combination, among themselves, and the other members of the Traders Live Stock Exchange, whereby it was agreed and understood that none of them would buy of or sell to plaintiff, any kind of live stock; also that they would not buy from or sell to any member of the Kansas City Live Stock Exchange, who bought or sold live stock to the plaintiff, and thereby forced the plaintiff out of business, to its great damage, etc.

In other words, the plaintiff charges that in violation of an act of the Legislature approved March 19, 1907, Laws 1907, pp. 377 to 382, being same as sections 10298, 10300, 10301, 10305 and 10313, Revised Statutes 1909, defendants entered into a pool, trust and combine, by which they agreed among themselves and with others, that they would not trade with the plaintiff; also by which they agreed not to trade with anyone who did trade with it and thereby drove the plaintiff out of business, to its damage, etc.

Those sections of the statute, in so far as here material, read as follows:

"Section 10298. Any person who shall create, enter into, become a member of or participate in any pool, trust, agreement, combination, confederation or under-

standing with any person or persons in restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this State or any article or thing bought or sold whatsoever, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and shall be punished as provided in this act.

"Section 10300. Any two or more persons engaged in buying or selling any article of commerce, manufacture, mechanism, commodity, convenience, repair, any product of mining, or any article or thing of any class or kind whatsoever, who shall create, enter into, become members of or participate in any pool, trust, agreement, combination, confederation, association or understanding to control or limit the trade in any such article or thing, or to. limit competition in such trade, by refusing to buy from or sell to any other person any such article or thing aforesaid, for the reason that such other person is not a member of or a party to such pool, trust, combination, confederation, association or understanding, or shall boycott or threaten any person from buying or selling to any other person who is not a member of or a party to such pool, trust, agreement, combination, confederation, association or understanding in such article or thing aforesaid, shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and punished as provided for in this act.

"Section 10301. All arrangements, contracts, agreements, combinations or understandings made or entered into between any two or more persons, designed or made with a view to lessen, or which tend to lessen, lawful trade, or full and free competition in the importation, transportation, manufacture or sale in this State of any product, commodity or article, . . . and any person or persons creating, entering into, becoming a member of or participating in such arrangements, contracts, agreements, combinations, or under-

standings shall be deemed and adjudged guilty of a conspiracy in restraint of trade, and punished as provided for in this act.

"Section 10305. Any person injured in his business or property by any other person or persons by reason of anything forbidden or declared to be unlawful by this act may sue therefor in any circuit court of this State in which the defendant or defendants, or any of them, reside, or have any officer, agent or representative, or in which any such defendant or any agent, officer or representative may be found, without regard to the amount in controversy, and shall recover threefold the damage by him sustained, and the costs of suit, including a reasonable attorney's fee.

"Section 10313. The enactment and taking effect of this law shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred by any corporation or person on account of the violation of any law of this State prior to the taking effect of this act."

In approaching the construction of these statutes two things should be borne in mind: first, what object did the Legislature intend to accomplish by said enactment? and, second, in what manner were the rights of the plaintiff affected by the economy thereof? I say economy, because the rights of the plaintiff, if any, are secondary and incidentally flow from the principal object of the act.

In order to properly appreciate the meaning of all remedial statutes, to which these belong, it is the duty of the court to investigate and ascertain the evil that existed, which the Legislature intended to abolish by the enactment, as well as the inducements offered and instrumentalities created for the abolition of said evil.

If we look back of the year 1899 (when this class of legislation was first enacted in this State, of which the present statutes are amendatory), which it is our duty to do, it will be seen from the current literature

of the day, and especially in the great daily papers of the country, that those who were engaged in almost all classes of production, manufacture, transportation and financial business, were organizing their respective businesses into pools, trusts and combines, for the purpose of limiting competition, reducing expenses and increasing their profits, with no intention, however, at that time, if I am correctly informed, to restrict commerce or to increase the prices of the necessities of life. But as time passed, the survivors of the new regime, becoming more avaricious and expert in combinations, conceived the idea that, since the law of supply and demand governed both the buying and selling prices of all articles of commerce, they could respectively extend the pools, trusts and combines, so as to limit not only competition, and lessen expenses, but also limit the supply of practically all of the necessities of life, and thereby increase the demand and correspondingly increase the prices to be paid therefor, by the public. Not only that, but by a system of boycotts, rebates, etc., the ''big business'' drove the little fellows out of business entirely, and thereby established pools, trusts and monopolies among themselves, and thereby, as previously stated, enabled them to not only limit production and restrain trade, but also to fix and maintain both buying and selling prices of all articles of commerce.

By that cold-blooded, avaricious and narrow business policy which so limited production, stifled trade and increased prices, an outraged and long-suffering public, through its Legislature, in 1907, enacted, among others, the statutes previously set out, for the purpose of destroying said pools, trust and combinations, and thereby restore competition and left the regulation of prices to be governed according to the old law of supply and demand, and to protect the weak against the strong, or the individual against the combinations.

I think that this is a true brief history of our legislation upon this subject.

It goes without saying that the plaintiff contends that it belongs to the weak and individual class mentioned, and that the statutes under consideration were intended for its protection, and the punishment of the strong.

Is this contention of plaintiff sound? I think not; for the reasons to be presently stated.

By looking at said section 10298, previously copied, it will be seen that it is leveled at all persons who enter into any pool, trust or combination for the purpose of limiting trade and competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this State, etc.

The plaintiff, as previously stated, was simply a commission merchant or agency, engaged in buying and selling live stock for others, on the Kansas City stockyards, for a commission. The plaintiff neither produced, manufactured, owned or carried any article of commerce, nor was it authorized to so do by its charter. That being true, as stated in the petition, it would be illogical and we would be unwarranted under the language of these statutes to hold that the pool, trust or combine formed against the plaintiff could in any manner result in "restraint of trade or competition in the importation, transportation, manufacture, purchase or sale of any product or commodity in this State." This is true for the reason that the plaintiff, as stated, was not engaged in trade, within the meaning of the statute, but was the agent of those who were so engaged, and as such it could not lessen competition, importation, transportation, manufacture, purchase or sale of any product or commodity of this State.

The questions of competition in transportation, restraint of trade and the purchase and sale of live stock shipped to Kansas City, are controlled by the trans-

portation companies, the owners of the stock, and the purchasers thereof, and not by the commission man or sales agent, at Kansas City.

But it might be suggested that the defendants were purchasers within the meaning of the language used. In answer to that suggestion, it is sufficient to state that while they are purchasers, yet it is not stated, nor is it a fact, that the combination charged against them was entered into for the purpose of doing the things prohibited by the statutes, but that it was formed solely to injure the plaintiff's commission business, and that by reason thereof, it, and not the public, was damaged.

There is no allegation contained in the petition that the unlawful pool, trust and combination formed by the defendants and other members of the Traders Exchange was formed for the purpose of doing injury to the plaintiff's patrons or customers, or to damage any other stock raiser, shipper, buyer or seller, but the charge is that they simply agreed among themselves not to buy or sell live stock through the plaintiff as a commission merchant.

For these reasons the patrons of the plaintiff should be entirely eliminated from the consideration of the case; all references to them but befog the legal propositions involved in the case.

There is no pretense that the combination charged against the defendants was intended to or did have any effect upon competition in the transportation of live stock to Kansas City; that it resulted or could in any manner have resulted in the restraint of trade, or was intended to or could have fixed or maintained prices within the meaning of the antitrust statutes; but as charged in the petition, was entered into for the purpose of injuring the plaintiff in its business as a commission merchant.

But independent of that, it is common knowledge, which the Legislature knew, as well as all others do,

that the live stock business of Kansas City does not depend upon any one or more commission merchants, but upon the broad territories of rich land in the center of which that city is located—blessed with copious rainfalls and deep floods of warm sunshine, producing the finest quality and greatest quantity of grain and grass that grow upon God's footstool, the food of man and beast. Recognizing these natural conditions favorable to a great live stock market, the Legislature enacted the laws in question for the use and benefit of the public, and not for the benefit of the commission men who sell the stock on the market.

That being true, and the further fact appearing from the petition that the plaintiff is not a member of the Kansas City Live Stock Exchange, and not a member of or eligible to membership in the Traders Exchange, and having no authority under its charter to purchase or sell live stock on its own account, but upon commission only, I see no legal objection to the right of the defendants, individually or collectively, to determine with whom they will or will not deal, so long as that agreement does not limit commerce or control prices.

I am now speaking of the plaintiff's rights and duties under the statutes, and not at common law, which I presume would afford redress for a wrong of this character if proven to the satisfaction of the jury.

If I correctly understand the meaning of the petition, the right of recovery is not predicated solely upon the facts that the conspiracy charged to have been made and entered into by and between the defendants and the members of the Traders Exchange, would entitle it to a recovery, if it were not for the further fact charged, that some agreement and the enforcement thereof not only damaged the plaintiff, but that it also, in a degree, destroyed competition in the live stock business at Kansas City, and tended to fix and maintain prices. That is to say, there being at the time

complained of, say two hundred live stock commission merchants in Kansas City and the plaintiff being one of them, then the unlawful conspiracy of the defendants against the plaintiff thereby destroyed competition in that business to the extent of one two-hundredths part thereof, by forcing it, one of the sales' competitors, out of the market.

I must confess that this is a novel proposition and probably would be more forceful had the plaintiff been engaged in the buying and selling of live stock upon its own account and not for others upon commission, as the petition charges. Should such an agreement be carried into execution it would reduce the number of commission merchants in Kansas City from two hundred to one hundred and ninety-nine, but would that in any manner result in restraint of trade in the live stock business or tend to increase the prices to be paid therefor upon that market?

A commission merchant, as such, neither produces nor ships live stock to any market, but his business is, as charged in the petition, confined to selling live stock to packers, order men and traders, raised and shipped to market by third parties. In other words, the commission man is simply an agent engaged in the business of selling one man's cattle to another for an agreed or a reasonable fee. That being unquestionably true, then can it be said that this petition charges or could truthfully charge that the live stock owner, the packer, trader or the consuming public was or could be damaged by the agreement complained of in this case?

It seems to me that the most damaging conclusion that could be drawn from the statements is that by forcing the plaintiff from the Kansas City market, the number and possibly the efficiency of the sales' agencies of the market were diminished to that extent; but can it be declared as a matter of law that the natural result of that diminution of agency would necessarily

lessen competition or increase the price of live stock in Kansas City, within the meaning of the statutes? I think not. No authority is cited in support of or against this proposition, and I have been unable to find any bearing upon the subject.

In order to accomplish such an effect under the statutes, if possible, which I deny, the petition should have charged and the evidence should have shown that by thus driving plaintiff out of business, the selling agencies of live stock on the Kansas City stockyards were so diminished and impaired that they were unable to handle the live stock consigned to that market, and that by reason thereof the market became glutted and the demands of the public could not be supplied, although there was a superfluity of live stock on the market for sale.

In construing these statutes, can it be seriously contended that the Legislature, when enacting them, had in mind this remote, if possible, condition of affairs, which had never existed and in all probabilities never will? This is one of the instances where the asking of the question answers it in the negative.

But by way of illustration: Suppose some member of this court and I had been trading with The Peck Dry Goods Company of Kansas City; that this afternoon we should step into that store and request *one of the clerks* therein to show us certain articles of merchandise; that in response thereto the clerk should say to us he would not do so because he considered us undesirable customers; that thereupon we should walk out of the store and agree between ourselves not to trade with The Peck Dry Goods Company any more, *through that clerk*; and that we should notify said company of that fact, could it be seriously contended that our said agreement would be a violation of the anti-trust statutes of this State and that we would be liable to Peck & Company for treble damages or for any other kind of damages for that matter? I think, clearly, not;

and that being unquestionably true, then how can it be logically said that the defendants in this case are liable to the plaintiff, the commission man or sales' agent of the stock growers mentioned in this case? There is not one whit of difference in principle between the two cases. Neither could or would interfere in the remotest degree with commerce, tend to stifle trade, create a monopoly or to fix or maintain prices. It might damage the individual commission man or sales' agent, but no one else.

Entertaining these views of the petition and the statutes upon which it is bottomed, I am clearly of the opinion that no cause of action is stated against the defendants.

The judgment of the circuit court is, therefore, reversed and the cause remanded.

PER CURIAM.—The foregoing opinion of WOODSON, J., written in division, with the illustration added near the end thereof, is adopted as the views of the Court in Banc.

The judgment is therefore reversed and the cause remanded.

• *Brown, Bond* and *Walker, JJ.,* concur; *Graves* and *Faris, JJ.,* concur in result; *Lamm, C. J.,* dissents.